[No. G008389. Fourth Dist., Div. Three. June 15, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE LEON SARKIS, Defendant and Appellant.

[Opinion certified for partial publication.[1]]

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV, which do not meet the standards for publication.

**COUNSEL**

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Raquel Gonzalez and Robert P. Whitlock, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SONENSHINE**—After a jury trial, George Leon Sarkis was convicted of arson (Pen. Code, § 451, subd. (c)) and insurance fraud (Ins. Code, § 556, subd. (a)). He contends he was prejudiced by instructional error. We affirm.

I

Sarkis owned a towing company until July 1987, when he sold it and purchased the Milano Delicatessen with the $50,000 proceeds. The seller had been losing money and, until Sarkis came along, planned to walk away from the business. Sarkis immediately made improvements to the premises and purchased additional equipment.

In August, Sarkis was approached by an agent for Farmers Insurance Company and purchased a fire policy from him in the amount recommended. However, he chose a higher deductible than was suggested. The policy covered the store's contents and income loss.

From July to September, the delicatessen had total gross sales of $12,547; the gross profit was 33.6 percent of that sum; nontaxable sales totalled $5,445; and its net operating loss was $3,126. In September, Sarkis signed a listing agreement to sell the deli for $75,000. When the agreement expired in October, he did not renew it.

Sarkis complained that the business was losing money and he wanted to sell it. In November, he told Pierre Habis of his disappointment in the business and asked him whether he knew someone "to put fire" to it. Habis replied he did not and, on his way home, stopped at the police station to report the conversation.

At 10:30 p.m. on December 24th, a fire broke out at the store. Although the store was equipped with a monitored security alarm system, the monitoring station did not receive a fire signal until contacted by the fire department at 12:10 a.m. on December 25th. The attic was heavily damaged but the business portion of the establishment sustained only smoke and water damage. A fire investigator could ascertain no accidental cause and determined the fire was deliberately set, based in part on the pattern and nature of the damage and a statement by Sarkis that he had closed the store, set the alarm, and left at about 9:30 p.m. There were no signs of forced entry, and no electrical problems were uncovered.

At the end of December, Sarkis reported gross sales for the period of October through December amounting to $61,042, a gross profit of 54.1 percent, and nontaxable sales of $52,763, an 869 percent increase over the preceding quarter. He told his accountant he could provide no documentation to support these figures because his records were destroyed in the fire. But the shelf upon which he said the records were kept was undamaged.

According to the accountant's figures, the store had lost $3,126 in the first quarter of operation (July-Sept.) and netted a profit of $25,187 in the second quarter (Oct.-Dec.). However, Sarkis's business bank account showed his withdrawals increasingly exceeding his monthly deposit totals. Sarkis attributed this to the large amount of business conducted on a cash basis.

Sarkis submitted a claim to Farmers on February 22, 1988, leaving the amount of loss blank. Farmers returned the form, requesting that he complete the blanks. He then claimed a loss of income of $43,290 and personal property loss of $130,000, the maximum allowable claims under the policy.

Sarkis maintained he did not set the fire, and his daughter confirmed he was home by about 9:30 p.m. that night. He denied having a conversation with Habis about burning the place and produced evidence Habis had spoken with another delicatessen owner and had vaguely mentioned a fire to him during one or two conversations. Sarkis also claimed his profits had been increasing and he was satisfied with the business.

## II

Sarkis contends the court's failure to instruct, sua sponte, on the definition of an aider and abettor constitutes reversible error. He points to the prosecutor's closing argument and to other instructions which alluded to aider and abettor liability as a possible theory upon which guilt could be grounded.

The prosecutor told the jury, in essence, it could find Sarkis guilty even if it did not believe he personally set the fire; it was sufficient if it believed "he caused it to be set." This argument was based on CALJIC No. 14.85.2, on which the jury was instructed: "Every person who willfully and maliciously sets fire to or burns or causes to be burned *or aids, counsels or procures the burning of any structure is guilty of the crime of arson.*" (Italics added.)

The jury was instructed to acquit Sarkis if it had a reasonable doubt he was present at the time and place of the commission of the offense. (CALJIC No. 4.50.) However, it was also told "if the evidence establishes beyond a reasonable doubt that the defendant *aided and abetted the commission of the offense* charged in this case, the fact, if it is a fact, that he was not present at the time and place of the commission of the alleged offense for which he is being tried is immaterial and does not, in and of itself, entitle him to an acquittal." (CALJIC No. 4.51, italics added.)

■ Sarkis argues the court was required to instruct the jury in accordance with CALJIC No. 3.01: "A person aids and abets the commission [] of a crime when he or she, (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime." He theorizes the jury "could well have erroneously predicated liability upon a finding that at one time, appellant discussed hiring someone with Habis, and then abandoned that intent without further acting upon it, for at one time he 'counseled' the burning of the structure, even though he later had no knowledge of the intent of the actual perpetrator."

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) The principle of law Sarkis raises is one requiring a finding that an aider and abettor had knowledge of the criminal purpose and promoted it, intending it would be accomplished by the perpetrator. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].)

Sarkis's defense was alibi. There was no contention he counselled the burning but later abandoned the idea and did not know of the actor's intent. Nonetheless, the prosecution did rely in some sense upon an aiding and abetting theory of liability, due in large part, no doubt, to its inability to

directly connect Sarkis to the act of ignition. This is so common a disability in arson cases that the statute defining the crime specifically includes those who aid, counsel, or procure its commission. (Pen. Code, § 451, subd. (c).)[2] Moreover, CALJIC No. 4.51 instructed the jury that Sarkis's alibi defense was unavailing if it found he "aided and abetted the commission of the offense." Thus, if the jury believed he was at home when the fire was ignited, it would have been compelled to acquit him in the absence of an aiding and abetting theory.

A definition of aiding and abetting was required, even in the absence of a request. However, it remains to be determined whether the error requires reversal. Relying on *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], Sarkis argues the failure to instruct on an element of intent is reversible error per se, unless it falls within the four exceptions delineated in *Croy*. Respondent counters that *Croy* has been impliedly overruled by *People* v. *Dyer* (1988) 45 Cal.3d 26 [246 Cal.Rptr. 209, 753 P.2d 1].

The *Dyer* court determined that "a reversal-per-se standard of review for *Beeman* error is inappropriate, and that henceforth the *Chapman* test, *supra*, 386 U.S. 18, 24, should be employed in such cases." (45 Cal.3d at p. 64.) Sarkis points out that the *Beeman* error to which the court referred "did not entirely remove the question of the defendant's mental state from the jury's consideration." (*People* v. *Croy*, *supra*, 41 Cal.3d at p. 13.) Unlike the error in *Beeman*, where the jury at least knew the defendant's state of mind was relevant, he argues here the jury received no direction to consider any state of mind.

Our reading of *Dyer* indicates its analysis applies in either event. The *Dyer* court applied the reasoning of an intervening decision of the United States Supreme Court in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], in which that court found an instruction that homicide is presumed to be malicious was error, in that it eliminated an element of murder. However, it concluded the *Chapman* standard was applicable to review the effect of the error. (*Rose* v. *Clark*, *supra*, 478 U.S. at p. 583 [92 L.Ed.2d at p. 474].) *Dyer* also relied upon *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], in which the same result was reached where an instruction wrongly apprised the jury regarding an element of the offense.

---

[2] We are not presented with, and do not pass upon, the question of the intent required of one who aids, counsels or procures the burning of a structure as defined in Penal Code section 451, subdivision (c). Whether such intent is identical to that required of one who "aids and abets" the commission of other types of crimes is immaterial here in view of the fact the jury was instructed pursuant to CALJIC No. 4.51. It alone warrants our conclusion the omitted instruction should have been given.

■ Even where an erroneous instruction fails to require the jury to find each element of the offense, reversal is not mandated where, after an analysis of its potential impact on the entire trial, the error is found to be harmless beyond a reasonable doubt. (*People* v. *Dyer, supra,* 45 Cal.3d at p. 63.) "Harmless-error analysis addresses . . . what is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, but in practice clearly had no effect on the outcome." (*Rose* v. *Clark, supra,* 478 U.S. at p. 582, fn. 11 [92 L.Ed.2d at p. 475].)

■ Applying the *Chapman* test, the record indicates beyond a reasonable doubt the error could not have affected the outcome. Sarkis's worst-case scenario, that a simple inquiry to Habis could be the basis of the jury's finding of liability without regard to intent, stretches reason. Sarkis's intent, in this sense, was not the issue. The arguments of counsel focused on his motive and his opportunity to set fire to the delicatessen *that night.* The prosecutor argued it did not matter whether Sarkis himself had returned and set the fire or he had given the key to someone else for that purpose. Either way, the jury was at all times asked to focus upon Sarkis's role in setting the events of that night in motion. The jury could not reasonably have believed he aided, counselled or procured the act, but did not intend the store be burned. In other words, "no rational jury could find the defendant committed the relevant criminal act but did not *intend* to cause the injury." (*Rose* v. *Clark, supra,* 478 U.S. at pp. 580-581 [92 L.Ed.2d at p. 472].)

### III, IV*

. . . . . . . . . . . . . . . . . . . .

The trial court properly awarded no credits, and the abstract of judgment is ordered corrected accordingly. In all other respects, the judgment is affirmed.

Wallin, Acting P. J., and Crosby, J., concurred.

---

*See footnote 1, *ante,* page 23.